UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MIKE CENTENO,

Plaintiff,

- against -

BROOKFIELD PROPERTIES MULTIFAMILY LLC and MATTHEW DIEHL,

Defendants.

24-CV-5238 (VSB)

**OPINION & ORDER**

Appearances:

Evan C. Brustein
Brustein Law PLLC
New York, NY
*Counsel for Plaintiff*

Daniel S. Gomez-Sanchez
Littler Mendelson, P.C.
Melville, NY

Brian P. FitzGerald
Littler Mendelson, P.C.
Cleveland, OH
*Counsel for Defendants*

VERNON S. BRODERICK, United States District Judge:

Mike Centeno ("Centeno" or "Plaintiff") brings this action pursuant to New York Labor Law § 740 against Defendants Brookfield Properties Multifamily LLC ("Brookfield") and Matthew Diehl ("Diehl") (collectively, "Defendants"). Before me is Defendants' motion to dismiss Plaintiff's Amended Complaint with prejudice. Because Plaintiff fails to plausibly allege (1) that Diehl was his employer; (2) that he reasonably believed that Brookfield violated a law, rule, or regulation or posed a specific danger to public health or safety; and (3) facts to

establish a causal connection between Plaintiff voicing complaints to Brookfield's executives and the termination of his employment, the motion to dismiss is GRANTED.

## I. Factual Background[1]

Plaintiff, a former Regional Director of Engineering with Brookfield, alleges that he raised concerns that Brookfield was involved in illegal bid-rigging of a request for proposal for a Jersey City project and violations of New York City Department of Buildings ("DOB") and U.S. Environmental Protection Agency ("EPA") regulations in a Manhattan project. (Doc. 16 ("Amended Complaint" or "Am. Compl.") ¶¶ 17–27, 34–80.) After raising these concerns, Plaintiff claims that he experienced a "deterioration in the way that he was treated by his superiors, including being excluded from the types of meetings and decisions that he had previously been involved in." (*Id.* ¶ 82.) Plaintiff asserts that his employment was subsequently terminated "for pretextual reasons, after he expressed concerns about illegal bid-rigging of a Request for Proposal, as well as Defendant Brookfield's decision to allow a company to continue working on a $100 million project despite illegal and unsafe work being performed at the project site (with violations of [DOB] regulations)." (*Id.* ¶ 1.)

### A. *Concerns Regarding Violations of DOB and EPA Regulations in Waterside Plaza*

In 2020, Plaintiff directed an employee for Urban America, Brookfield's a third-party vendor, to immediately stop removing parquet flooring in a project for Waterside Plaza in Manhattan because of what Plaintiff believed to be a failure to follow EPA regulations for asbestos abatement. (*Id.* ¶¶ 37, 44–46.) Diehl and others began calling Plaintiff to ask why he

[1] The facts set forth herein are taken from the allegations contained in the Amended Complaint. (*See generally* Am. Compl.) I assume Plaintiff's allegations in the Amended Complaint to be true for purposes of this motion. *See Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 237 (2d Cir. 2007). However, my reference to these allegations should not be construed as a finding as to their veracity, and I make no such findings.

stopped the work in Waterside Plaza, and Plaintiff responded by telling them that he had safety concerns because he believed the Urban America employees were improperly removing flooring. (*Id.* ¶¶ 47–48.) When pushed about how Plaintiff knew that the removed flooring contained asbestos and whether he tested the flooring, Plaintiff stated that he reasonably believed that the removed flooring contained asbestos due to his experience and training and that he believed that it would test positive for asbestos if it were tested. (*Id.* ¶¶ 49–52.) Diehl told Plaintiff that they were not going to test the flooring and would not put anything about asbestos in writing because Brookfield was trying to purchase the property and "not to rock the boat." (*Id.* ¶¶ 53, 55.) Plaintiff feared that he would lose his job if he continued to push back, so he stopped discussing his safety concerns regarding this incident. (*Id.* ¶ 56.)

At the end of 2021, Plaintiff again observed what he believed to be improper removal of flooring from Waterside Plaza in violation of the safety protocols required by the EPA for handling potential asbestos. (*Id.* ¶ 57.) Plaintiff did not put his concerns in writing, and instead told Diehl and other Brookfield executives that he observed an incorrect process for handling possible asbestos laced flooring during a scheduled call regarding the Waterside Plaza renovations. (*Id.* ¶¶ 58–59.) Prior to the call, Plaintiff was told by Brookfield's Asset Manager not to speak about his concerns during the call and that the Brookfield Asset Manager would address Plaintiff's concerns with Urban America separately. (*Id.* ¶ 59.)

In early 2022, Plaintiff again observed Urban America employees improperly removing flooring from Waterside Plaza in violation of the safety protocols required by the EPA for handling potential asbestos. (*Id.* ¶ 62.) Plaintiff regularly reported back to Diehl and other senior executives about the safety concerns and violations of DOB regulations at Waterside Plaza, often including pictures documenting the violations and safety concerns. (*Id.* ¶¶ 64–65.)

Plaintiff continued to observe several violations of DOB regulations throughout 2022 and 2023—involving installing PVC lines for waste line drainage, using wood framing with non-fire-retardant products for installation in closets, splicing Bx wiring instead of using a splice box to join wires together, and replacing old bathtubs with non-ADA compliant shower stalls—which he reported to Diehl and other Brookfield executives. (*Id.* ¶¶ 67–77.)

During a February 2023 monthly meeting Plaintiff raised concerns regarding: (1) illegal bid-rigging related to a Jersey City project, discussed below, *see infra* Part I.B; (2) illegal work being performed in violation of DOB regulations in Waterside Plaza; and (3) Urban America's continued permission to work on the project despite the safety concerns and violations. (*Id.* ¶¶ 31, 34.)

In the Spring of 2023, Plaintiff complained to Diehl about repeated safety and regulation violations committed by Urban America and criticized Brookfield for continuing to allow Urban America to work on the $100 million project despite these concerns. (*Id.* ¶¶ 79–80.) Diehl told Plaintiff that he discussed Plaintiff's concerns with the East Coast President of Brookfield and that going forward, Plaintiff should not put any of his concerns in writing, text message, or email, but that his concerns should instead be raised by calling Diehl directly. (*Id.* ¶ 81.) Plaintiff subsequently noticed "a deterioration in the way he was treated by his superiors, including being excluded from the types of meetings and decisions that he had previously been involved in." (*Id.* ¶ 82.)

### B. *Concerns Regarding Bid-Rigging of a Request for Proposal for a Jersey City Project*

In his role as a Regional Director of Engineering, Plaintiff was also involved with Brookfield's process for Request for Proposals ("RFPs") related to proposed work on "jobs in the New York/New Jersey region." (*Id.* ¶ 16.) Plaintiff reviewed RFPs for a project in Jersey

City submitted by three companies: CJ Vanderbeck, F&G, and G&S Investors. (*Id.* ¶¶ 20–23.) Plaintiff believed that CJ Vanderbeck submitted the lowest and best bid for the project. (*Id.* ¶ 22.) Plaintiff also believed that an employee from G&S Investors tipped off F&G about what the lowest bid was and that although Brookfield was aware that F&G was tipped off, they still allowed F&G to reduce its bid to match the bid from CJ Vanderbeck and ultimately win the RFP. (*Id.* ¶¶ 24–25.) Plaintiff believed that this was unethical and on January 27, 2023, he sent an email to "his superiors at [] Brookfield, including [] Diehl, stating in relevant part: 'Telling another vendor a competitor's bid to match defeats the entire RFP process and I find it dishonest. We could always ask all vendors for a best and final but not inform them of the price to match or beat. CJ Vanderbeck submitted their bid fair and square and should be awarded the contract[.] . . . I am against this process and decision.'" (*Id.* ¶¶ 26–27 (emphasis omitted).) On February 1, 2023, Brookfield's Regional Director responded to Plaintiff: "[W]e really need to get these water heaters installed without further delay, so we've made the decision to move forward with F&G. G&S Investors is a 50% partner and we are just not going to win this fight with them. I appreciate all your input and guidance on this." (*Id.* ¶ 29 (alterations adopted and emphasis omitted).)

During his February 2023 monthly meeting with Diehl in which Plaintiff discussed his concerns regarding Waterside Plaza, (*id.* ¶ 34), Plaintiff again raised the alleged illegal bid-rigging, telling Diehl that "sharing information about a competitor's bid with another vendor compromised the legitimacy of the bidding process and was unethical and fraudulent," and Diehl agreed. (*Id.* ¶¶ 31–33.)

### C. *Human Resources Investigation and Termination of Employment*

On July 14, 2023, several Brookfield associates were questioned about a Fourth of July party purportedly organized by Plaintiff, although the associates advised Brookfield's Human Resources that Plaintiff did not throw a Fourth of July party. (*Id.* ¶¶ 83–85.) Brookfield's Human Resources questioned Plaintiff about the Fourth of July party as well as Plaintiff's daughter's employment with a third-party vendor. (*Id.* ¶¶ 88–89.) On July 27, 2023, Plaintiff was notified that he was suspended pending the outcome of Brookfield's investigation. (*Id.* ¶¶ 94–95.) On August 4, 2023, Diehl terminated Plaintiff's employment because Plaintiff's daughter was hired by a third-party vendor the year prior, even though Plaintiff had not been involved in the decision to hire her, and Brookfield was aware of Plaintiff's daughter's employment for at least six months without previously raising it as a concern. (*Id.* ¶¶ 13–14, 95–96.)

## II. <u>Procedural History</u>

Plaintiff commenced this action by filing a complaint on July 11, 2024. (Doc. 1.) The complaint only asserted a violation of New York Labor Law ("NYLL") § 740. (*Id.* ¶¶ 27–30.) On September 10, 2024, Defendants filed a motion to dismiss the complaint. (Doc. 6.)

On October 10, 2024, I granted Plaintiff's leave to file an amended complaint and, in light of the forthcoming amended complaint, denied Defendants' motion to dismiss as moot. (Doc. 14.) On October 23, 2024, Plaintiff filed the Amended Complaint. (*See* Am. Compl.) The Amended Complaint also only contained a claim for violation of NYLL § 740. (*Id.* ¶¶ 99–102.)

On November 8, 2024, Defendants filed a motion to dismiss the Amended Complaint, (Doc. 17), along with a memorandum of law in support of the motion to dismiss, (Doc. 18

("Mem.")). On January 10, 2025, Plaintiff filed his opposition to the motion to dismiss. (Doc. 21 ("Opposition" or "Opp'n.").) On January 24, 2025, Defendants filed their reply memorandum of law in support of the motion to dismiss. (Doc. 22.)

## III. Legal Standard

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim will have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* This standard demands "more than a sheer possibility that a defendant has acted unlawfully." *Id.* "Plausibility . . . depends on a host of considerations: the full factual picture presented by the complaint, the particular cause of action and its elements, and the existence of alternative explanations so obvious that they render plaintiff's inferences unreasonable." *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 430 (2d Cir. 2011). A complaint need not make "detailed factual allegations," but it must contain more than mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Iqbal*, 556 U.S. at 678 (internal quotation marks omitted). Although all allegations contained in the complaint are assumed to be true, this tenet is "inapplicable to legal conclusions." *Id.*

## IV. Discussion

Section 740 of the NYLL provides, in relevant part, that '[a]n employer shall not take any retaliatory action against an employee . . . because such employee . . . discloses . . . to a supervisor . . . an activity, policy or practice of the employer that the employee reasonably believes is in violation of law, rule or regulation or that the employee reasonably believes poses a

substantial and specific danger to the public health or safety." NYLL § 740(2)(a). "Law, rule or regulation" is expressly defined to include: "(i) any duly enacted federal, state or local statute or ordinance or executive order; (ii) any rule or regulation promulgated pursuant to such statute or ordinance or executive order; or (iii) any judicial or administrative decision, ruling or order." NYLL § 740(1)(c). Section 740 requires a plaintiff to show: "(1) retaliatory action, (2) activity protected by the statute, and (3) a causal link between the two." *Collison v. WANDRD, LLC*, 737 F. Supp. 3d 231, 245–46 (S.D.N.Y. 2024) (quoting *Pierce v. Better Holdco, Inc.*, No. 22-CV-4748, 2023 WL 6386920, at *4 (S.D.N.Y. Sept. 29, 2023)). "Complaints alleging a violation of section 740 need not plead an actual violation of laws or regulations to survive a motion to dismiss. However, to prevail against a motion to dismiss[,] a plaintiff must show a causal connection between the protected activity and the adverse employment action, and allege a specific danger to the public health or safety." *Sokolovsky v. Silver Lake Specialized Care Ctr.*, No. 21-CV-01598, 2023 WL 5977298, at *12 (E.D.N.Y. Sept. 14, 2023) (internal quotation marks omitted).

Defendants argue that the Amended Complaint should be dismissed because (1) Diehl is not an "employer" under NYLL § 740; (2) Plaintiff fails to adequately plead that he engaged in activity protected within the meaning of NYLL § 740; and (3) Plaintiff fails to adequately plead causation between Plaintiff's alleged protected activity and his termination. (Mem. 1.) I analyze each of Defendants' arguments in turn.

### A. *Diehl was not Plaintiff's Employer*

The NYLL defines an employer as "any person, firm, partnership, institution, corporation, or association that employs one or more employees." NYLL § 740(1)(b). "The Second Circuit has articulated an 'economic reality' test that governs whether an individual

qualifies as an employer in . . . NYLL cases." *Komorek v. Conflict Int'l, Inc.*, No. 22-CV-09467, 2024 WL 1484249, at *5 (S.D.N.Y. Mar. 29, 2024) (citing *Zheng v. Liberty Apparel Co.*, 355 F.3d 61, 71 (2d Cir. 2003)). "The court looks to four factors—though they are not exhaustive—that ask whether the alleged employer: (1) could hire and fire employees; (2) supervised employee work schedules and conditions of employment; (3) determined the rate and method of payment; and (4) maintained employment records." *Id.* (citing *Carter v. Dutchess Cmty. College*, 735 F.2d 8, 12 (2d Cir. 1984)). "[A]lthough each of these factors may prove helpful in assessing a worker's employment classification, no single factor of the test is dispositive. Instead, any determination regarding an alleged employment relationship must be based on the totality of the circumstances." *Fernandez v. Kinray, Inc.*, 406 F. Supp. 3d 256, 261 (E.D.N.Y. 2018). The Second Circuit has held that the *Carter* factors "can be sufficient to establish employer status," although they are not "necessary." *Zheng*, 355 F.3d at 69 (emphasis omitted).

Although Plaintiff does not allege that Diehl hired him, he does allege that "Diehl terminated Plaintiff's employment." (Am. Compl. ¶ 96.) Moreover, Plaintiff alleges that Diehl was his supervisor, Plaintiff reported his concerns to Diehl, and Plaintiff had monthly meetings with Diehl.[2] (*Id.* ¶¶ 27–29, 31–32, 34, 48–55, 59, 64–65, 73, 78–81; *see also* Opp'n 15.) Plaintiff does not allege that Diehl "determined the rate and method of payment" or "maintained employment records." *Komorek*, 2024 WL 1484249, at *5 (citing *Carter*, 735 F.2d at 12).

Although Plaintiff asserts that "Diehl supervised Plaintiff's work schedule and conditions of employment," (Am. Compl. ¶ 95), he merely copies verbatim the second *Carter* factor without alleging any supporting facts; therefore, these allegations are insufficient to plead that Diehl in

[2] Plaintiff describes his meeting in February 2023 as his "February monthly meeting with Defendant Diehl," implying that he met with Diehl monthly. (Am. Compl. ¶¶ 31, 34.)

fact supervised Plaintiff's work schedule and conditions of employment. *See Ortiz v. Consol. Edison Co. of New York, Inc.*, No. 22-CV-8957, 2024 WL 3086161, at *14 (S.D.N.Y. June 7, 2024) (determining that the allegation that defendants "maintained and exercised its power to hire, fire, promote, and discipline Plaintiffs . . . are insufficient to plead that the [] Defendants had the power to hire or fire Plaintiffs"), *report and recommendation adopted*, 2024 WL 3105686 (S.D.N.Y. June 24, 2024). "Indeed, '[c]ourts in this District have routinely dismissed complaints that do nothing but recite the *Carter* and *Zheng* factors and claim that an alleged employer satisfies them without offering further detail.'" *Id.* (quoting *Orellana v. Real Innovative Constr., LLC*, No. 18-CV-8396, 2020 WL 13469284, at *6 (S.D.N.Y. Feb. 6, 2020) (collecting cases)).

Plaintiff does allege that Diehl called him to ask why Plaintiff stopped the work in Waterside Plaza, told Plaintiff that they were not going to test the floor for asbestos, and instructed Plaintiff not to put his complaints in writing, ultimately telling Plaintiff that all of his concerns should be handled by calling Diehl directly, (Am. Compl. ¶¶ 47–55, 81), but this is similarly insufficient to establish that Diehl had control over Plaintiff's work schedule and conditions of employment. Plaintiff's citation to *Noble v. 93 Univ. Place Corp.* is unpersuasive because the record there showed that the individual defendant was the "Chaiman of the Board of University and owne[ed] 100 percent of its outstanding stock," the plaintiff reported to the Chairman, and the Chairman "retained supervisory, hiring, and firing powers over the employees at University's stores." 303 F. Supp. 2d 365, 376 (S.D.N.Y. 2003). Plaintiff does not similarly allege what Diehl's role was at Brookfield, including whether Diehl had any ownership interest in Brookfield, that Diehl had the authority to manage wages, or that Diehl had hiring powers. *See Kaplan v. Wings of Hope Residence, Inc.*, 18-CV-2972, 2020 WL 616630 (E.D.N.Y. Feb. 7,

2020) (finding plaintiffs' claims insufficient where they satisfactorily alleged the individual defendants' firing authority, but the record was "devoid of any allegations that the Individual Defendants' determined the Plaintiff's rate of pay or maintained employment records" and Plaintiff failed to "raise any allegations pertaining to two of the four prongs of the *Carter* test"); *Yongfu Yang v. An Ju Home, Inc.*, No. 19-CV-5616, 2020 WL 3510683, at *4–5 (S.D.N.Y. June 29, 2020) (granting defendants' Rule 12(c) motion because they were not employers, even when one *Carter* factor—supervision and control of employees' work schedules or conditions of employment—weighed in favor of "formal control."); *Cho v. Osaka Zen Spa*, No. 19-CV-7935, 2024 WL 3360619, at *8 (S.D.N.Y. July 10, 2024) (finding that an individual defendant was not an employer because allegations that the defendant exercised "some control over the conditions of [Plaintiff's] employment under *Zheng* or the second *Carter* factor is not necessarily sufficient to defeat a 12(c) motion.").

Considering the totality of circumstances, I find that Plaintiff does not sufficiently plead that Diehl was Plaintiff's employer. *Cf. Dinome v. Cordis US Corp.*, No. 23-CV-11173, 2024 WL 3888799, at *5 (S.D.N.Y. Aug. 21, 2024) (finding that an individual defendant was an employer because the plaintiff pled sufficient facts that the individual defendant "hired her, determined the work assignments she received, [] issued her a written disciplinary warning . . . was in a position to offer her a promotion," and "had the authority to fire" plaintiff); *DeLorenzo v. Coffey*, No. 24-CV-1735, 2025 WL 753951, at *4 (S.D.N.Y. Mar. 10, 2025) (finding that individual defendants were employers because they "had significant control over [the plaintiff's] schedule, his status as their private chef, and the conditions under which he worked" and "were able to decide whether [the plaintiff] would continue to be employed"); *Papa v. Computacenter United States Inc.*, No. 25-CV-3788, 2025 WL 2081555, at *3 (S.D.N.Y. July 24, 2025) (finding

that an individual defendant was an employer because he was the plaintiff's "direct supervisor, controlled the IT services that [the individual defendant's] team delivered to [the company], and could cause [the] hir[ing] and ret[ention of] individual members of that team" and "in retaliation for [the plaintiff] reporting security breaches, [the individual defendant] took part in directing the termination of [the plaintiff's] employment"); *Pinheiro v. Interior Mogul LLC*, No. 22-CV-9856, 2024 WL 4716346, at *4 (S.D.N.Y. Aug. 28, 2024), *report and recommendation adopted*, 2025 WL 3054389 (S.D.N.Y. Oct. 31, 2025) (finding that an individual defendant was an employer because he "ran [the company's] day to-day operations, made all business decisions, including hiring and firing employees, supervising them, and setting their pay and schedules"); *Inclan v. New York Hosp. Grp., Inc.*, 95 F. Supp. 3d 490, 511 (S.D.N.Y. 2015) (finding that an individual defendant was an employer because "the evidence inescapably leads to the conclusion that [he] dominated, financially controlled, and exercised significant functional control over not only the general business affairs of the Restaurant, but indeed over plaintiffs' wages" and "[a]s a practical matter, [the individual defendant] was the Restaurant's 'top man'"). Accordingly, I dismiss Diehl as a defendant.

### B. *Plaintiff Fails to Adequately Allege that He Reasonably Believed Brookfield Violated a Law, Rule, or Regulation, or That Defendants Posed a Substantial Danger*

Although Plaintiff may have believed that a law, rule, or regulation was violated in the Jersey City RFP and the renovations in Waterside Plaza, he fails to identify specific practices and activities by Brookfield related to the Jersey City RFP or renovations in Waterside Plaza that resulted in or caused a violation of a law, rule, or regulation. Plaintiff alleges that Brookfield moved forward with F&G after Plaintiff raised concerns of alleged bid-rigging in the Jersey City RFP. (*See* Am. Compl. ¶ 25 ("Upon information and belief, Defendant Brookfield was aware

that F&G had been tipped off, but still allowed F&G to reduce its bid to match the CJ Vanderbeck bid and get the work."); *id.* at ¶ 29 ("On February 1, 2023, Michael Cheeks, the Regional Director – Multifamily, wrote an email to Plaintiff stating that 'we really need to get these water heaters installed without further delay, so we've made the decision to move forward with F&G. G&S Investors is a 50% partner and we are just not going to win this fight with them. I appreciate all your input and guidance on this.'" (alterations adopted and emphasis omitted)).) Plaintiff also alleges that Brookfield continued to permit Urban America, Brookfield's third-party vendor, to work on the Waterside Plaza project despite Plaintiff raising concerns of observed DOB, EPA, and ADA violations related to Urban America's renovating flooring, installing PVC lines for waste line drainage, using wood framing with non-fire-retardant products for use in closets, splicing Bx wiring instead of using a splice box to join wires together, and replacing old bath tubs with non-ADA compliant shower stalls from 2020 through the Spring of 2023. (*Id.* at ¶¶ 34–37, 44–80.) Plaintiff further notes that the removal of parquet flooring was not in accordance with the EPA's regulations for the disposal of asbestos material, a carcinogen, to prevent asbestos from being air-borne and consequently flowing through the building, (*id.* at ¶¶ 42–52, 57–59, 61–62), and that the PVC lines for waste line drainage were illegal because PVC is plastic and thus flammable, which "is very dangerous as it can cause a fire to spread quickly," (*id.* at ¶¶ 68–69).

Defendants argue that Plaintiff's allegations that they violated certain regulations must be dismissed because Plaintiff "does not offer sufficient facts as to what individual(s) employed by the third-party vendor were allegedly violating the law, what specific laws were violated, or how these actions posed a substantial and specific danger to public health or safety" and "Plaintiff offers no specificity as to how Defendants' actions – not the actions of third-party Urban

America – were in violation of any law." (Mem. 14.) Defendants similarly allege that Plaintiff's bid-rigging theory must be dismissed because "Plaintiff never plausibly alleged Defendants violated a government law or how Defendants' actions posed a specific danger to public health or safety." (*Id.*)

"To the extent [D]efendant[s] argue[] that [P]laintiff has failed to identify a particular law, rule or regulation that has been violated, or that [P]laintiff reasonably believed was violated, the New York Court of Appeals struck down that requirement." *Zhang v. Centene Mgmt. Co., LLC*, No. 21-CV-5313, 2023 WL 2969309, at *17 (E.D.N.Y. Feb. 2, 2023) (citing *Webb-Weber v. Comty. Action for Hum. Servs., Inc.*, 15 N.E.3d 1172, 1174 (N.Y. 2014) ("[F]or pleading purposes, the complaint need not specify the actual law, rule or regulation violated, although it must identify the particular activities, policies or practices in which the employer allegedly engaged, so that the complaint provides the employer with notice of the alleged complained-of conduct.")). Instead, "[t]he complaint 'must [only] identify the particular activities, policies or practices in which the employer allegedly engaged.'" *Id.* at *17 (quoting *Webb-Weber*, 15 N.E.3d at 1174–75); *see also Leach v. Univ. at Buffalo Pediatric Assocs., Inc.*, No. 20-CV-1836S, 2021 WL 1723129, at *7 (W.D.N.Y. Apr. 30, 2021) ("[A]t this stage, [the plaintiff] need only allege that she reported the activity or practice in which the employer engaged."); *Arazi v. Cohen Bros. Realty Corp.*, No. 20-CV-8837, 2022 WL 912940, at *13 (S.D.N.Y. Mar. 28, 2022) (finding that "[p]laintiffs' allegations are sufficient to allege that [d]efendant violated law or public policy" "because [p]laintiffs have identified the specific policies and practices in which [d]efendant engaged"). In other words, to maintain a claim pursuant to Labor Law § 740, a plaintiff must challenge "an activity, policy or practice *of the employer*." NYLL § 740(2)(a) (emphasis added).

Here, Plaintiff does not allege that Brookfield, rather than F&G or Urban America, was engaging in any of the conduct that Plaintiff believes violated laws, rules, or regulations or was a threat to public health and safety. *See Komorek*, 2024 WL 1484249, at *7 (holding that the plaintiffs' assertions related to a third-party accounting firm could not be challenged under NYLL § 740 because the third-party firm was "not a party to this litigation" and the plaintiffs "fail[ed] to identify any practices that [defendant] itself engaged in that [plaintiffs] reasonably believed were illegal"). Instead, Plaintiff asserts that "Defendants were paying another company to violate laws, rules and/or regulations and also pose a substantial and specific danger to the public health or safety," "Defendant Brookfield knew that it was paying Urban America to do illegal work," and likens the relationship between the third-parties and Brookfield to a "person who hires a hitman [who] is fully liable for the murder." (Opp'n 22.) Plaintiff has not cited any case law that would support me holding Brookfield liable for the conduct of F&G in the Jersey City RFP or Urban America in the Waterside Plaza renovations, nor am I aware of any. Plaintiff also fails to proffer any allegations in the Amended Complaint that Brookfield was involved in the bid-rigging of the Jersey City RFP or paid Urban America to violate laws, rules, or regulations. Instead, the allegations in the Amended Complaint indicate that Plaintiff raised concerns about these projects and Brookfield nonetheless moved forward with F&G for the Jersey City project and permitted Urban America to continue working on Waterside Plaza. (Am. Comp. ¶¶ 17–27, 34–80.) Plaintiff fails to allege "what [Brookfield's] violations were or how [Brookfield] engaged in such misconduct." *Komorek*, 2024 WL 1484249, at *7. In fact, the very case that Plaintiff cites and discusses in his opposition brief, *Dinome v. Cordis US Corporation.*, held that the plaintiff's complaints regarding a third-party physician and not the defendant entity did "not sufficiently implicate an activity or practice [the defendant entity]

engaged in that was unlawful." No. 23-CV-11173, 2024 WL 3888799, at *5 (S.D.N.Y. Aug. 21, 2024). The *Dinome* Court noted that the plaintiff there had not explicitly alleged that she believed the defendant entity itself participated in the unlawful kickback scheme and that the plaintiff argued for the first time in her opposition that the defendant entity was also engaging in the same unlawful activity. *Id.* The *Dinome* Court rejected this argument because "the Complaint cannot be amended by briefs in opposition to a motion to dismiss." *Id.* (internal quotation marks omitted). Here too, Plaintiff's arguments do not implicate Brookfield's activities or practices, but rather Urban America's, and Plaintiff's attempt to introduce a new argument, that Brookfield "was paying another company to violate laws, rules and/or regulations" and "knew that it was paying Urban America to do illegal work," (Opp'n 22), must fail because they were introduced in the opposition brief for the first time.[3] *See Fac., Alumni, & Students Opposed to Racial Preferences v. N.Y. Univ. L. Rev.*, No. 18-CV-9184, 2020 WL 1529311, at *7 (S.D.N.Y. Mar. 31, 2020) ("It is well established in this district that a plaintiff cannot amend his pleadings in his opposition briefs."), *aff'd sub nom.*, 11 F.4th 68 (2d Cir. 2021); *Indiviglio v. B&G Foods, Inc.*, No. 22-CV-9545, 2023 WL 9022866, at *7 (S.D.N.Y. Dec. 29, 2023) ("[A] plaintiff may not assert new facts or theories for the first time in opposition to a motion to dismiss" (alteration adopted and internal quotation marks omitted)); *Sarakhman v. Sumitomo Mitsui Fin. & Leasing Co., LTD.*, No. 24-CV-5817, 2025 WL 2494288, at *5 (S.D.N.Y. Aug. 29, 2025) ("Generally, a Plaintiff cannot amend his complaint through opposition papers, and allegations added in opposition to a motion to dismiss cannot cure defects in the operative pleading." (internal quotation marks omitted)).

---

[3] Moreover, Plaintiff does not cite to any authority in his Opposition to support this newly raised argument that Defendants can or should be held liable for the alleged actions of third-party Urban America.

Thus, Plaintiff fails to plausibly allege that any specific activity Brookfield was engaging in violated a law, rule, or regulation, and Defendant's motion to dismiss could separately be granted on this basis.

### C. *Plaintiff Fails to Adequately Allege Causation*

Plaintiff alleges that he complained to Diehl and other Brookfield executives regarding Urban America's violations of various regulations at Waterside Plaza from 2020 through some time in the Spring of 2023. (Am. Compl. ¶¶ 44–79.) Plaintiff also alleges a single instance of alleged bid-rigging that he objected to twice, once on January 27, 2023, and again sometime in February 2023. (*Id.* ¶¶ 27, 31.) More than six months passed between the last time that Plaintiff voiced concerns regarding the alleged bid-rigging and the termination of his employment in August 2023. (*Id.* ¶ 96.) Given the uncertainty of the date Plaintiff last voiced concerns regarding the Waterside Plaza, it is likely that at least two months passed between Plaintiff's last complaint and the termination of his employment in August 2023. (*Id.*) "Although the Second Circuit has not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship, district courts in this Circuit have consistently held that a passage of more than two months between the protected activity and the adverse employment action does not allow for an inference of causation." *Garrett v. Garden City Hotel, Inc.*, 2007 WL 1174891, at *21 (E.D.N.Y. Apr. 19, 2007) (internal quotation marks omitted) (collecting cases); *accord Sealy v. State Univ. of N.Y. at Stony Brook*, 834 F. App'x 611, 614 (2d Cir. 2020) (summary order) ("[W]e have held that adverse employment actions occurring approximately three months after protected activity are too attenuated to give rise to an inference of retaliation."); *Veronko v. Cnty. of Suffolk*, No. CV 16-2490, 2018 WL 11697437, at *23 (E.D.N.Y. Jan. 30, 2018) ("[A]s a matter of law, the temporal proximity, approximately four

months, is simply too attenuated to permit such an inference in the absence of additional evidence establishing Defendant's retaliatory motive." (collecting cases)). Plaintiff has not alleged any other factors to suggest that I should infer causation from the longer time frame here. *Cf. Rivera v. Balter Sales Co. Inc.*, No. 14-CV-1205, 2014 WL 6784384, at *5 (S.D.N.Y. Dec. 1, 2014) (finding that the plaintiff sufficiently pleaded retaliation because "the five-month delay between the EEOC charge and the retaliatory conduct can be explained by the fact that the allegedly retaliatory action was timed to coincide with the EEOC mediation"). This is especially true with respect to the Waterside Plaza complaints that Plaintiff alleges he raised concerns about for approximately three years prior to his ultimate termination. *See Accettola v. He*, No. 23-CV-1983, 2025 WL 843412, at *10 (S.D.N.Y. Mar. 18, 2025) (finding that "there is little in the record to support the inference that Plaintiff's termination was undertaken in response to any disclosure by Plaintiff," when objections made closer to her termination were not "met with a different, more hostile response than her earlier objections" throughout her "multi-year employment.")

Accordingly, Plaintiff's NYLL § 740 claim also separately fails because there is insufficient evidence to infer a causal connection between Plaintiff voicing his complaints to Brookfield's executives and the termination of his employment.

## V. Conclusion

For the reasons stated herein, Defendants' motion to dismiss is GRANTED with prejudice. The Clerk of Court is respectfully directed to terminate the motion to dismiss at Doc. 17 and Doc. 18, and close the case.

SO ORDERED.

Dated: September 8, 2026
New York, New York

Vernon S. Broderick
United States District Judge